**RECORD NO. 21-2313**

In The

# United States Court Of Appeals
### For The Fourth Circuit

**J. DUANE GILLIAM, Guardian of the Estate of Leon Brown;
RAYMOND CURTIS TARLTON,
Guardian *Ad Litem* for Henry Lee McCollum;
KIMBERLY ANN PINCHBECK, as Limited Guardian and
Conservator of the Estate of Henry Lee McCollum,**

*Plaintiffs – Appellees,*

v.

**LEROY ALLEN;
CHARLOTTE NOEL FOX,
Administrator of the Estate of Kenneth Snead,**

*Defendants – Appellants,*

**and**

**ROBESON COUNTY; TOWN OF RED SPRINGS; KENNETH SEALEY, both individually and in his
official capacity as the Sheriff of Robeson County; LARRY FLOYD;
PAUL CANADY, Administrator C.T.A of the Estate of Luther Haggins;
ROBERT E. PRICE, Administrator C.T.A of the Estate of Joel Garth Locklear, Sr.,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH**

––––––––––––––––––

## BRIEF OF APPELLANTS

––––––––––––––––––

Adam F. Peoples
HALL BOOTH SMITH, PC
72 Patton Avenue
Asheville, NC 28801
(828) 232-4481

Austin A. Atkinson
Pearson K. Cunningham
HALL BOOTH SMITH, PC
191 Peachtree Street, NE
Suite 2900
Atlanta, GA 30303
(404) 954-5000

Scott D. MacLatchie
HALL BOOTH SMITH, PC
11215 North Community House Road
Suite 750
Charlotte, NC 28277
(980) 948-7820

*Counsel for Appellants*          *Counsel for Appellants*          *Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2313__      Caption: __J. DUANE GILLIAM, et. al. v. LEROY ALLEN, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Leroy Allen and Charlotte Noel Fox, Administrator of the Estate of Kenneth Snead__
(name of party/amicus)

_____

 who is ____Defendants/Appellants____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO


2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                       ☐YES☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Austin Atkinson _____        Date: _____12.07.21_____

Counsel for:  Defendants/Appellants _____

- 2 -

Print to PDF for Filing

# <u>TABLE OF CONTENTS</u>

**Page:**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE .............................................................. 3

    I.    After McCollum and Brown are twice convicted for the murder and rape of Buie, they receive pardons ..................... 3

    II.    With the District Court's help, McCollum and Brown receive a $75-million verdict .................................................. 5

        A.    The District Court determines McCollum and Brown were irrefutably innocent ................................... 5

        B.    With the District Court's support, Britt concludes Plaintiffs' confessions must have been coerced ............. 6

        C.    The District Court bolsters the expert testimony of Plaintiff's' innocence .................................................. 8

        D.    The District Court accuses defense counsel of seeking Plaintiffs' execution ........................................ 10

        E.    The District Court treats Defendants' qualified immunity defense with indifference ............................. 11

        F.    Liability was a foregone conclusion and Plaintiffs' counsel only needed to ask the jury for damages ........ 12

    III.    The District Court awards Plaintiffs an additional $42 million and denies Defendants' post-trial motions ............. 13

i

SUMMARY OF ARGUMENT ................................................. 13

STANDARDS OF REVIEW ................................................. 14

ARGUMENT .................................................................. 15

    I.    The District Court's errors justify a new trial ..................... 15

        A.    The District Court preempted any liability defense when it declared Plaintiffs innocent and admitted the pardons .................................... 15

            1.    The pardons are not conclusive proof of innocence ............................................. 15

            2.    The District Court decided liability against Defendants .......................................... 17

            3.    The District Court should not have admitted the pardons .......................................... 19

        B.    The District Court improperly permitted Britt to speculate on the heart of the case and opine against Defendants' credibility .................................... 20

            1.    Britt's opinions were not lay testimony ............. 20

            2.    Britt usurped the jury's role ............................... 21

            3.    The error was not harmless .............................. 22

        C.    The District Court advocated for Plaintiffs and bolstered their case ...................................... 25

        D.    The District Court deprived Defendants of their qualified immunity defense ......................... 26

        E.    Cumulatively, the District Court's errors also overwhelmingly justify a new trial. ............................ 34

F.     The District Court's conduct warrants reassignment on remand ............................................. 35

II.     Plaintiffs should not have been awarded $36 million in prejudgment interest ........................................................ 35

III.     Defendants should have received a credit against the judgment accounting for Plaintiffs' other recoveries .......... 41

    A.     Defendants did not waive the issue ............................. 42

    B.     The District Court erred in refusing to apply any credit ........................................................................... 46

IV.     The district court abused its discretion in awarding $6.5 million in attorney fees and costs under Section 1988 ................................................................................... 51

    A.     The district court erred in awarding out-of-district rates ................................................................ 51

    B.     The District Court erred in when it awarded virtually all of the hours claimed by the HL attorneys ..................................................................... 57

CONCLUSION ....................................................................... 59

STATEMENT RESPECTING ORAL ARGUMENT ............................... 59

CERTIFICATE OF COMPLIANCE ....................................... 61

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Anderson v. Warden, Maryland Penitentiary,*
    696 F.2d 296 (4th Cir. 1982) ........................................................ 24

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ...................................................................... 31

*Bacon v. Lee,*
    549 S.E.2d 840 (N.C. 2001) ...................................................... 4, 15

*Baity v. Brewer,*
    122 N.C. App. 645, 470 S.E.2d 836 (1996) .................................. 48

*Banks ex rel. Banks v. Tokemick,*
    177 F. Supp. 2d 239 (S.D.N.Y. 2001) .......................................... 49

*Barnard v. Theobold,*
    721 F.3d 1069 (9th Cir. 2013) ...................................................... 38

*Battle v. Ledford,*
    912 F.3d 708 (4th Cir. 2019) ........................................................ 48

*Beach Mart, Inc. v. L&L Wings, Inc.,*
    784 Fed. App'x 118 (4th Cir. 2019) .............................................. 35

*BUC Intern. Corp. Intern. Yacht Council Ltrd.,*
    517 F.3d 1271 (11th Cir. 2008) .................................................... 44

*Buckley v. Mukasey,*
    538 F.3d 306 (4th Cir. 2008) ........................................................ 14

*Buffington v. Baltimore County,*
    913 F.2d 113 (4th Cir. 1990) ........................................................ 52

*Burke v. Regaldo*,
935 F.3d 960 (10th Cir. 2019) ........................................ 49

*Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*,
745 F.3d 703 (4th Cir. 2014) ......................................... 23

*Cavannaugh v. Woods Cross City*,
718 F.3d 1244 (10th Cir. 2013) .............................. 31, 32

*Chisholm v. UHP Projects, Inc.*,
205 F.3d 731 (4th Cir. 2000) .................................. 44, 47

*City of Milwaukee v. Cement Div. Nat. Gypsum Co.*,
515 U.S. 189 (1995) ....................................................... 36

*Cordero v. De Jesus-Mendez*,
922 F.2d 11 (1st Cir. 1990) ...................................... 38, 39

*Cottrell v. Caldwell*,
85 F.3d 1480 (11th Cir. 1996) ................................. 28, 30

*Deadwyler v. Volkswagen of America, Inc.*,
884 F.2d 779 (4th Cir. 1989) ......................................... 27

*Dionne v. Mayor & City Council of Baltimore*,
40 F.3d 677 (4th Cir. 1994) .......................................... 47

*Duran v. Town of Cicero*,
653 F.3d 632 (7th Cir. 2011) .................................. 43, 46

*Durham v. SMI Indus. Corp.*,
882 F.2d 881 (4th Cir. 1989) .................................. 43, 44

*Eden v. Amoco Oil Co.*,
741 F. Supp. 1192 (D. Md. 1990) .................................. 39

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
822 F.3d 709 (4th Cir. 2016), *vacated on other grounds*,
137 S. Ct. 1239 (2017) .................................................. 35

*Gierlinger v. Gleason*,
  160 F.3d 858 (2nd Cir. 1998) .......................................................... 38

*Gilliam v. Sealey*,
  932 F.3d 216 (4th Cir. 2019) ...................................................... 3, 33

*Goad v. Macon County*,
  730 F. Supp. 1425 (M.D. Tenn. 1989) ...................................... 49, 50

*Havis v. Petroleum Helicopters, Inc.*,
  664 F.2d 54 (5th Cir. 1981) ............................................................ 38

*Harris v. Union Elec. Co.*,
  846 F.2d 482 (8th Cir. 1988) .......................................................... 45

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ............................................................ 52, 56, 57

*Howard v. City of Durham*,
  No. 1:17CV477, 2021 WL 5086379
  (M.D.N.C. Nov. 2, 2021) .................................................... 16, 18, 20

*James v. Jacobson*,
  6 F.3d 233 (4th Cir. 1993) ........................................................ 15, 41

*Jerden v. Amstutz*,
  430 F.3d 1231 (9th Cir. 2005) ........................................................ 34

*Johnson v. Breeden*,
  280 F.3d 1308 (11th Cir. 2002) ...................................................... 27

*Kassman v. American Univ.*,
  546 F.2d 1029 (D.C. Cir. 1976)....................................................... 46

*Kerr v. City of Chicago*,
  424 F.2d 1134 (7th Cir. 1970) ........................................................ 19

*Knussman v. Maryland*,
  272 F.3d 625 (4th Cir. 2001) .......................................................... 27

*Lamonaca v. Tread Corp.*,
    157 F. Supp. 3d 507 (W.D. Va. 2016) ............................................ 58

*Littrell v. Franklin*,
    388 F.3d 578 (8th Cir. 2004) ....................................................... 28

*MacKethan v. Burrus, Cootes and Burrus*,
    545 F.2d 1388 (4th Cir. 1976) ............................................ 44-45, 48

*Malek v. Fed. Ins. Co.*,
    994 F.2d 49 (2d Cir. 1993)............................................................ 23

*Mason v. City of New York*,
    949 F. Supp. 1068 (S.D.N.Y. 1996) ............................................. 49

*McDow v. Rosado*,
    657 F. Supp. 2d 463 (S.D.N.Y. 2009) ...................................... 39-40

*Memphis Cmty. School Dist. v. Stachura*,
    477 U.S. 299 (1986) ............................................................ 37, 50

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ..................................................................... 32

*Monessen Southwestern Ry. Co. v. Morgan*,
    486 U.S. 330 (1988) ..................................................................... 37

*Mowry v. Whitney*,
    81 U.S. 620 (1871) ....................................................................... 37

*Nat'l Wildlife Fed. v. Hanson*,
    859 F.2d 313 (4th Cir. 1988) ....................................................... 54

*Newburgh Land & Dock Co. v. Texas Co.*,
    227 F.2d 732 (2nd Cir. 1955)....................................................... 38

*Ohio Valley Env't Coal. V. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ....................................................... 17

*Patel v. Lanier County,*
   969 F.3d 1173 (11th Cir. 2020) ...................................................... 27

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,*
   483 U.S. 711 (1987) ........................................................................ 52

*Poleto v. Consol. Rail Corp.,*
   826 F.2d 1270 (3rd Cir. 1987) ........................................................ 36

*Project Vote/Voting for America, Inc. v. Long,*
   887 F. Supp. 2d 704 (E.D. Va. 2012) .............................................. 55

*Pyler v. Evatt,*
   902 F.2d 273 (4th Cir. 1990) .......................................................... 52

*Quesinberry v. Life Ins. Co. of N. America,*
   987 F.2d 1017 (4th Cir. 1993) ........................................................ 39

*Robinson v. Equifax Information,*
   560 F.3d 235 (4th Cir. 2009) .......................................................... 53

*Rum Creek Coal Sales, Inc. v. Caperton,*
   31 F.3d 169 (1994) ........................................................ 14-15, 52, 58

*Simmons v. Bradshaw,*
   879 F.3d 1157 (11th Cir. 2018) ........................................ 30, 31, 33

*Singer v. Olympia Brewing Co.,*
   878 F.2d 596 (2nd Cir. 1989).................................................... 46, 48

*Sloas v. CSX Transp. Inc.,*
   616 F.3d 380 (4th Cir. 2010) ............................................ 14, 42, 43

*Smith v. Baltimore City Police Dep't,*
   840 F.3d 193 (4th Cir. 2016) .......................................................... 23

*Snowden v. D.C. Transit Sys., Inc.,*
   454 F.2d 1047 (D.C. Cir. 1971)...................................................... 45

viii

*Stephens v. Doe,*
   332 F.3d 68 (2nd Cir. 2003) ........................................................... 32

*Thomas v. Texas Dept. of Criminal Justice,*
   297 F.3d 361 (5th Cir. 2002) ........................................................ 41

*Thompson v. City of Chicago,*
   722 F.3d 963 (7th Cir. 2013) ........................................................ 34

*United States v. Aberant,*
   No. 19-4786, 2021 WL 5401474 (4th Cir. Nov. 18, 2021) .............. 35

*United States v. Brown,*
   62 F. App'x 516 (4th Cir. 2003) .................................................... 22

*United States v. Cassiagnol,*
   420 F.2d 868 (4th Cir. 1970) ........................................................ 25

*United States v. Cecil,*
   836 F.2d 1431 (4th Cir. 1988) ................................................. 21, 22

*United States v. Garcia,*
   855 F.3d 615 (4th Cir. 2017) ........................................................ 17

*United States v. Hassan,*
   742 F.3d 104 (4th Cir. 2014) ........................................................ 21

*United States v. Lefsih,*
   867 F.3d 459 (4th Cir. 2017) .................................................. 25, 26

*United States v. Lentz,*
   383 F.3d 191 (4th Cir. 2004) ........................................................ 35

*United States v. Lespier,*
   725 F.3d 437 (4th Cir. 2013) ........................................................ 22

*United States v. Perkins,*
   470 F.3d 150 (4th Cir. 2006) ........................................................ 20

*United States v. Simpson,*
  910 F.2d 154 (4th Cir. 1990) ....................................................... 19

*United States v. Strickland,*
  No. 08-4640, 2010 WL 235080 (4th Cir. Jan. 21, 2010) ............... 35

*United States v. Umana,*
  750 F.3d 320 (4th Cir. 2014) ....................................................... 32

*United Tech. Corp. v. American Home Assurance Co.,*
  237 F. Supp. 2d 168 (D. Conn. 2001) ...................................... 42, 44

*Ward v. AutoZoners, LLC,*
  958 F.3d 254 (4th Cir. 2020) ....................................................... 34

*Williamson v. Handy Button Mach. Co.,*
  817 F.2d 1290 (7th Cir. 1987) ..................................................... 40

*Willingham v. Crooke,*
  412 F.3d 553 (4th Cir. 2005) ............................................. 27, 28, 29

*Wolfe v. Johnson,*
  565 F.3d 140 (4th Cir. 2009) ....................................................... 42

*W. Va. v. U.S.,*
  479 U.S. 305 (1987) ..................................................................... 36

*Yamaha Motor Corp. v. Jim's Motorcycle, Inc.,*
  381 F. Supp. 2d 499 (E.D. Va. 2005) ........................................... 55

*Zellner v. Summerlin,*
  494 F.3d 344 (2nd Cir. 2007) ...................................................... 30

**Statutes:**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1343 ................................................................................ 1

28 U.S.C. § 1988 ......................................................................... 55

42 U.S.C § 1983 ................................................................... *passim*

42 U.S.C. § 1988 .................................................................. *passim*

N.C. Gen. Stat. § 1B-4(1) ........................................................ 48

N.C. Gen. Stat. § 15A-269 ......................................................... 4

N.C. Gen. Stat. § 15A-270 ......................................................... 4

N.C. Gen. Stat. § 15A-1469 ...................................................... 16

N.C. Gen. Stat. § 148-82 .................................................... 5, 47

**Constitutional Provisions:**

N.C. Const. art. III, § 5, cl. 6 ............................................... 16

U.S. Const. amend. IV ................................................................ 5

**Rules:**

Fed. R. App. P. 4(a)(4) .............................................................. 1

Fed. R. Civ. P. 26(a)(2)(B) ..................................................... 20

Fed. R. Civ. P. 26(a)(2)(C) ..................................................... 20

Fed. R. Civ. P. 59 ....................................................................... 1

Fed. R. Civ. P. 59(e) ........................................................ *passim*

Fed. R. Evid. 201(b) ................................................................ 17

Fed. R. Evid. 403 ..................................................................... 19

Fed. R. Evid. 701 ..................................................................... 20

**Other Authorities:**

Restatement (Second) of Judgments, § 50 (1982) .................................. 45

Restatement (Second) of Torts, § 885(3) (1979) .................................... 45

*One Satisfaction Rule*, Black's Law Dictionary (11th ed.) .................... 45

*Setoff*, Black's Law Dictionary (11th ed. 2019) ...................................... 43

## **STATEMENT OF JURISDICTION**

In this civil-rights litigation under 42 U.S.C § 1983, the District Court's subject-matter jurisdiction was premised on 28 U.S.C. §§ 1331 and 1343. The case was tried to a jury verdict in May 2021, and the District Court entered judgment on the verdict on May 14, 2021. [JA2384–86]. Plaintiffs and Defendants then moved for relief under Federal Rule of Civil Procedure 59. The District Court ruled on the motions in October 2021, and it entered a final, amended judgment on October 22, 2021. [JA329–92]. The district court then amended the judgment again on November 5, 2021, awarding Plaintiffs attorney fees and costs under 42 U.S.C. § 1988. [JA3313–14]. Defendants filed a timely notice of appeal on November 19, 2021. *See* Fed. R. App. P. 4(a)(4). This Court has appellate jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In 2014, a North Carolina court vacated the convictions of Plaintiffs-Appellees Henry Lee McCollum and Leon Brown for the 1983 rape and murder of Sabrina Buie. Plaintiffs then sued various police officers under 42 U.S.C. § 1983 involved in the criminal investigation of Buie's death, including Defendants-Appellants Leroy Allen and Kenneth Snead. In May 2021, the case proceeded to trial against Defendants and others, and following a settlement with the other defendants, the jury returned $75-million verdict against Allen and Snead. The District Court amended the judgment to add $36 million in prejudgment interest, and it later awarded Plaintiffs $6.5 million in attorney fees and costs.

The issues on appeal are as follows:

I.    Do the District Court's trial errors warrant the grant of a new trial?

II.   Did the District Court err in granting Plaintiffs $36 million in prejudgment interest?

III.  Did the District Court err in refusing amend the judgment and reduce it by $11.5 million to account for Plaintiffs other recoveries?

IV.   Did the District Court err in awarding $6.5 million in attorney fees in its Section 1988 award?

## STATEMENT OF THE CASE

**I.    After McCollum and Brown are twice convicted for the murder and rape of Buie, they receive pardons.**

In September 1983, 11-year-old Sabrina Buie was found raped and murdered in a field in Red Springs, North Carolina, which is located in Robeson County. At the request of the Red Springs Police Department, North Carolina State Bureau of Investigation ("SBI") agents, including Leroy Allen and Kenneth Snead, joined the murder investigation. [*See* JA1495–1499]. A few days into the inquiry, investigators received a tip that 19-year-old Henry McCollum had been involved in Buie's murder. [JA1503]. Following this lead, Allen and Snead, along with Robeson County detective Kenneth Sealey, met with McCollum at the local police station. [*See* JA1503–1507].

The details of what occurred during the interview are, as this Court has previously noted, "at the heart of this case." *Gilliam v. Sealey*, 932 F.3d 216, 222 (4th Cir. 2019). It is undisputed, though, that McCollum signed a written statement that night confessing to Buie's murder. [JA1507–1508]. Later that night, McCollum's younger brother, Leon Brown, similarly confessed to the crimes.

3

Both were arrested, convicted, and sentenced to death in 1984. [*See* JA2203]. On appeal, however, the Supreme Court of North Carolina vacated Plaintiffs' convictions because of errors in the jury instructions. [JA2204]. Plaintiffs were eventually retried separately and convicted again in 1991 and 1992. [*Id.*].

At Brown's request, the North Carolina Innocence Inquiry Commission ("Innocence Commission") opened an investigation into Plaintiffs' convictions. [*Id.*]. During its investigation, the Innocence Commission matched DNA on a cigarette butt found near the crime scene to Roscoe Artis, who had been convicted of a murder that occurred after Buie's death. [*See* JA1224]. So with the Innocence Commission's help, Plaintiffs asked a North Carolina superior court to vacate their convictions under N.C. Gen. Stat. § 15A-269 and § 15A-270. [*See* JA2203–2205].[1] The superior court did so, with the consent of the local district attorney, Johnson Britt. [JA2203–2206]. At Plaintiffs' request, and exercising his unfettered authority, *see Bacon v. Lee*, 549 S.E.2d 840, 847 (N.C. 2001), the Governor later issued McCollum and Brown each a "pardon of innocence." [JA792–800].

---

[1] Sections 15A-269 and 15A-270 provide a remedy for post-conviction relief where the evidence is simply "favorable."

Plaintiffs each received $750,000 from the North Carolina Industrial Commission pursuant to the State's statutory wrongful conviction procedure. *See* N.C. Gen. Stat. § 148-82.

## II. With the District Court's help, McCollum and Brown receive a $75-million verdict.

McCollum and Brown eventually filed this 42 U.S.C. § 1983 lawsuit alleging Defendants coerced their confessions in violation of the Fourth Amendment and their due-process rights. The matter proceeded to trial in front of the Honorable Terrence W. Boyle in May 2021 against Allen and Snead,[2] as well as the Robeson County defendants.[3]

### A. The District Court determines McCollum and Brown were irrefutably innocent.

Before trial, Plaintiffs moved *in limine* for the District Court to admit the Governor's pardons and take "judicial notice" of Plaintiffs' innocence. [*See* JA800, 808–10]. Over Defendants' objections and a motion to exclude the pardons, the District Court admitted the pardons

---

[2] Snead passed away during the course of the proceedings and Charlotte Noel Fox was substituted in his place as the Administrator of his estate.

[3] The Robeson County defendants later settled out on the final day of trial for $9 million. [JA1826]. Plaintiffs settled with the Town of Red Springs defendants for $1 million in December 2017. [JA3293].

and took judicial notice of their purported effect. [JA810–11]. In the District Court's view, when the Governor issued the pardons "[h]e made an executive finding that . . . [Plaintiffs] . . . were innocent." [JA810].

Plaintiffs relied on this finding throughout the trial, and when they failed to mention it, the District Court routinely chimed in on their behalf and reminded the jury. During his opening statement, for example, Plaintiffs' counsel told the jury McCollum and Brown had been "declared innocent by the State of North Carolina." [*See, e.g.*, JA984, 987]. And during Defendants' counsel's opening statement, in front of the jury, the District Court accused counsel of trying to "impeach the pardon[s] of innocence." [JA1037]. The District Court made sure the "jury [took] note of" counsel's "bad start" to the trial, [*Id.*], because, again, Plaintiffs were "innocent for the purpose of this trial." [JA1323].

## B. With the District Court's support, Britt concludes Plaintiffs' confessions must have been coerced.

Plaintiffs called former Robeson County District Attorney Johnson Britt first. Over two days, Britt explained why Plaintiffs were innocent, attacked Defendants' credibility, speculated about what occurred during Plaintiffs' interviews, and opined that Defendants coerced Plaintiffs' confessions.

6

Britt served as District Attorney from 1994 until 2019. [JA1039]. During his tenure, Britt supported vacating Plaintiffs' convictions, and he wrote a six-page letter to the Governor urging him to issue the pardons. [*See* JA1045; JA2181–85]. Britt addressed these issues at trial and reiterated his belief in Plaintiffs' innocence to the jury and explained away any contradictory evidence. [JA1045–62].

For example, with no basis (and over objection), he opined that McCollum's later videotaped confession to a television reporter was meaningless because McCollum was "surprised" when he made it. [JA1060]. He told the jury that Artis murdered Buie, even though Artis never confessed or was convicted. [JA1051]. And he exclaimed to the jury that the Governor's pardons "obliterate[d] the convictions of" McCollum and Brown. [JA1095].

Britt also conjectured about alleged misconduct in the investigation. He suggested, for example, that it was common practice for investigators from the SBI (an organization he was never a part of) to destroy and withhold crucial notes in 1983 (more than 10 years before he became District Attorney). [JA1069–1079]. And he tried to support his allegations with speculation about unrelated systemic corruption in the Robeson County Sheriff's Department in the 1980s. [JA1075–76].

Most notably, though, Britt directly attacked Defendants' credibility. He told the jury that he "d[id] not believe" Defendants' descriptions of the interrogations. [JA1091; *see also* JA1080 (when asked if he found Defendants' "descriptions [of the interrogations] credible," Britt responded, "No, sir")]. According to Britt, "there would have yelling, there may have been cussing, there may have been threatening remarks." [JA1091]. Indeed, he was allowed to testify without any foundation, that Snead "was a specialist that was brought in to [] *break a person* during the course of an interview." [JA1092 (emphasis added)].

If that were not enough, the District Court made sure the jury would believe Britt. Interjecting into the examination, the District Court lauded Britt as "one of the most renowned district attorneys America" and proclaimed that the jury "couldn't find anybody whose credentials are more sacred that Mr. Britt's." [JA1106–07].

## C. The District Court bolsters the expert testimony of Plaintiff's' innocence.

Shortly after offering Britt's sweeping opinions, Plaintiffs presented Dr. Richard Leo, a psychology professor focused on researching police interrogations and "psychological coercion and false confessions," as an expert witness. [JA1256–57]. The "point of [Leo's] testimony," the

District Court stated in front of the jury, was to answer "the question: Why would an innocent person confess to a crime they didn't commit?" [JA1257]. This was the "paramount question," [*id.*], because the District Court had already declared Plaintiffs innocent.

According to Leo, innocent people can be "induced to . . . agreeing to false information" when they "feel coerced and distressed to the point that they will say anything" to escape the interrogation. [JA1258]. This is especially true, he testified, when the interviewer makes "[p]romises and threats" or "lies about evidence." [JA1258–59]. And based on this premise—and because Plaintiffs were innocent—Leo told the jury Plaintiffs experienced "very psychologically coercive interrogations." [JA1264–65].

The District Court again bolstered Plaintiffs' case during Leo's testimony and elicited irrelevant testimony favorable to Plaintiffs. After explaining that Plaintiffs' IQs were near a "third grade educational level," and in response to the District Court's questioning, Leo essentially testified that Plaintiffs lacked the capacity to commit the crimes. [JA1283–85].

### D. The District Court accuses defense counsel of seeking Plaintiffs' execution.

McCollum and Brown testified next. Because it had declared that the pardons were conclusive about Plaintiffs' innocence, the District Court prevented defense counsel from even suggesting otherwise. [*See, e.g.*, JA1321–23]. In doing so, the District Court reminded the jury that Plaintiffs were "innocent for the purposes of this trial" and that "the Governor ha[d] found" them innocent. [JA1323].

But it did not stop there: While McCollum was testifying, the District Court exclaimed, in front of the jury, "[Defendants'] version is that [McCollum is] a murder and . . . that he *ought to be executed*." [*Id.* (emphasis added)]. Similarly, during Brown's testimony, the District Court told Brown that defense counsel "wants to say that you're a murderer and a rapist." [JA1362]. The District Court then repeated the point to counsel and accused counsel of trying to convict Brown:

> THE COURT: Your position is he's a murderer and a rapist. And so go with it and see where that goes.
>
> [COUNSEL]: This is my last question, your Honor.
>
> THE COURT: See if you can convict him again.

[JA1363].

**E.   The District Court treats Defendants' qualified immunity defense with indifference.**

The District Court treated Defendants' qualified immunity defense with indifference and as an afterthought throughout the proceedings. Before trial, Defendants asked the District Court to bifurcate the issue so it could properly consider the defense using special interrogatories. [JA952–54]. Defendants provided the District Court with examples from other trials around the Fourth Circuit,[4] and although the District Court recognized that special interrogatories were appropriate, it arbitrarily limited the number of interrogatories to five, which Defendants explained was inadequate. [*Id.*]

At the charge conference, counsel reiterated the need for more than five specific interrogatories and importance of specificity. [*See* JA1796–1800]. For example, Defendants' requested interrogatories went to core factual disputes this Court previously assumed to be true before concluding what clearly established law proscribed in 1983. [*Id.*]. Plaintiffs' requested interrogatories, however, bypassed whether the facts supported a violation of clearly established law. Still, the District Court rejected Defendants' requested interrogatories in favor of Plaintiffs'.

---

[4]   [*See, e.g.*, JA936–39].

**F.     Liability was a foregone conclusion and Plaintiffs' counsel only needed to ask the jury for damages.**

The District Court's finding and emphasis on Plaintiffs' innocence—combined with the barrage of "evidence" presented—left the jury to deliberate only damages. The District Court decided liability for the jury with its rulings and conduct.

Plaintiffs' counsel's closing argument shows this: Counsel asked the jury to cure the "grave injustice" Plaintiffs suffered, which he feigned was Plaintiffs' burden to show. [JA1844 ("We have proven by a preponderance of the evidence that a grave injustice occurred.")]. Yet citing the District Court's finding of innocence, counsel told the jury Plaintiffs "served 31 years in prison for a crime they didn't commit," which he said was, "by definition, a grave injustice." [JA1845].

Plaintiffs' counsel went on to reference the District Court's finding of innocence about a dozen more times before asking for over $60 million in damages. [*See, e.g.*, JA1846 ("They are innocent."); *id.* ("[The Innocence Commission] investigated this independently as a neutral and she concluded that they were innocent."); JA1848 ("You [] heard Judge Boyle instruct you not once, not twice, but three time that he took judicial notice that Henry and Leon were innocent.")]. The jury awarded Plaintiffs their

requested $62 million in compensatory damages, plus $13 million in punitive damages. [JA2377–78].

## III. The District Court awards Plaintiffs an additional $42 million and denies Defendants' post-trial motions.

After the verdict, the District Court resolved the qualified immunity defense based on the jury's responses to the interrogatories and then entertained post-trial motions. Because Plaintiffs' interrogatories were framed at such a high level of generality, the District Court summarily concluded that an affirmative response meant qualified immunity was necessarily unavailable for the particular claim.

The District Court then awarded Plaintiffs $36 million in prejudgment interest, denied Defendants' Rule 59(e) motion for an $11-million credit against the judgment, denied Defendants' motion for a new a trial, and awarded Plaintiffs $6 million in attorney fees.

## SUMMARY OF ARGUMENT

The District Court repeatedly erred, and Defendants deserve a new trial, in front of a different trial court. To start, when the District Court took "judicial notice" that Plaintiffs were innocent of the crime, it decided liability. Plaintiffs' central theme at trial was that Defendants must have coerced the confessions because Plaintiffs are innocent. Thus, after the

District Court determined Plaintiffs were irrefutably innocent, the jury could effectively reach only one conclusion. And to the extent there remained a factual dispute about Plaintiffs' confessions, the only evidence on the issue was Plaintiffs' and Defendants' testimony. Yet the District Court allowed one of Plaintiffs' key witnesses to testify that Defendants were lying—and even vouched that the witness was trustworthy. To ensure a Plaintiffs' verdict, moreover, the District Court actively advocated for Plaintiffs throughout the trial, often attacking Defendants and their counsel. This Court should thus vacate the judgment, order a new trial, and reassign the case on remand.

## **STANDARDS OF REVIEW**

The decision whether to grant a new trial is committed to the district court's discretion, and thus, this Court reviews the denial of a new trial for an abuse of discretion. *Buckley v. Mukasey*, 538 F.3d 306, 317 (4th Cir. 2008). Similarly, this Court's review of the District Court's rulings on the Rule 59(e) motions, as well as the District Court's award of attorney fees and costs under Section 1988, is also governed by the abuse of discretion standard. *Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 388 (4th Cir. 2010); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169,

174 (1994). Although the abuse of discretion standard is deferential, it is not without limits. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993).

## ARGUMENT

## I. The District Court's errors justify a new trial.

Following trial, the District Court remarked that the verdict likely represented "the highest jury award in a wrongful conviction case to date." [JA3310]. This happened, though, because of the District Court's errors, and this Court should vacate the judgment.

### A. The District Court preempted any liability defense when it declared Plaintiffs innocent and admitted the pardons.

The District Court should not have admitted Plaintiffs' pardons, much less taken judicial notice of their purported effect as conclusive of Plaintiffs' innocence in this trial. In doing so, the District Court preempted any liability defense, and this was error.

#### 1. The pardons are not conclusive proof of innocence.

As an initial matter, the Governor made no "finding" that Plaintiffs are innocent. The North Carolina Constitution grants the Governor "absolute clemency authority." *Bacon v. Lee*, 549 S.E.2d 840, 847 (N.C. 2001); *id.* at 855 ("The exercise of clemency power is the 'exclusive

prerogative' of the Governor."); *see* N.C. Const. art. III, § 5, cl. 6 (vesting the Governor with discretion to grant "reprieves, commutations, and pardons . . . upon such conditions as he may think proper"). No statute controls (or could control) when or why the Governor may issue a "pardon of innocence." And the Governor never made a "finding" that Plaintiffs are innocent, even if the pardons are described as "pardons of innocence." The pardons instead explain that a court vacated and dismissed with prejudice Plaintiffs' convictions, with the District Attorneys' consent. [JA795–99]. The Governor, in other words, did not suggest Plaintiffs were, as a matter of fact, innocent or even state his belief in their innocence.[5]

The District Court therefore erred in taking judicial notice of Plaintiffs' innocence. A court may take judicial notice of a "fact that is not

---

[5] As Chief Judge Schroeder of the Middle District recently explained when analyzing the same issue, only the Innocence Commission is empowered to determine factual innocence. *See Howard v. City of Durham,* 2021 WL 5086379 at *2 n.4 (M.D.N.C. 2021). But that proceeding did not ultimately occur here. As Sharon Stellato testified, the the Innocence Commission's investigation stopped once the superior court granted Plaintiffs' motion for appropriate relief. So an adjudicatory hearing before the Commission never occurred. [JA1248-49]. Thus, there was no conclusive finding that Plaintiffs were "innocent of the convicted charges." *See* N.C.G.S. § 15A-1469.

subject to reasonable dispute because" that fact "is generally known within the trial court's territorial jurisdiction[] or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). While a court may at times take judicial notice that a document exists, *United States v. Garcia*, 855 F.3d 615, 621–22 (4th Cir. 2017), a court may not take judicial notice of what a document means or draw inferences from the document. *Ohio Valley Env't Coal. V. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009); *see also Garcia*, 855 F.3d at 621–22. The basis for the Governor's decision therefore is not properly subject to judicial notice. The Governor's reasoning is not indisputable, and the District Court erred when it inferred the Governor's belief that Plaintiffs are innocent from the documents, alone. To be sure, in order to conclude that Plaintiffs are, in fact, innocent via the pardons, the District Court had to conclude the Governor's purported finding was indisputably correct. But that was obviously a contested issue below.

> 2.    *The District Court decided liability against Defendants.*

The error was significant. When the District Court declared Plaintiffs "innocent for the purposes of this trial," it decided liability in

Plaintiffs' favor. [JA1323]. To be sure, Plaintiffs' theory of liability is that Defendants must have coerced Plaintiffs into confessing *because they were innocent*.[6] Plaintiffs explained this when they argued below that the pardons (and their innocence) were evidence of coercion because "innocent individuals do not normally confess to crimes they did not commit." [D.E. 445 at 11 (citation and internal quotation marks omitted)]. But even if Plaintiffs' theory is appropriate, when the District Court declared Plaintiffs innocent, it "supplanted" its finding for the jury's and decided liability. *C.f. Howard v. City of Durham*, No. 1:17CV477, 2021 WL 5086379, at *6 (M.D.N.C. Nov. 2, 2021).

Indeed, Plaintiffs' counsel told the jury innocence was enough to establish liability. [*See* JA1845 ("[Innocence] is, by definition, a grave injustice.")]. So he reminded the jury that "Judge Boyle instructe[ed] you not once, not twice, but three time that he took judicial notice that [Plaintiffs] were innocent." [JA1848; *see also* JA1845 ("Judge Boyle has told you several times . . . that [Plaintiffs] are innocent.")]. And he tied in Dr. Leo's testimony (Plaintiffs' psychology expert), which Plaintiffs

---

[6] [*See, e.g.*, JA1848 (arguing to the jury that the convictions were a "grave injustice" and thus Defendants were liable because Plaintiffs are innocent)].

offered to explain why "*an innocent person* [would] confess to a crime they didn't commit." [JA1257]. Leo explained that innocent people falsely confess when they "feel coerced" because of lies and threats from police. [JA1258]. And because Plaintiffs were irrefutably innocent in the jurors' minds, they could reach only one conclusion: that Defendants *must have* coerced the confessions. [*See* JA1848 (referencing Leo's testimony in closing)]. This error warrants vacating the judgment under any standard because it necessarily "affected the verdict reached." *United States v. Simpson*, 910 F.2d 154, 158 (4th Cir. 1990) (citation and internal quotation marks omitted).

###### 3.   *The District Court should not have admitted the pardons.*

Even if the District Court had not declared Plaintiffs' innocent, and even if some evidence of Plaintiffs' innocence were relevant, the pardons should have been excluded under Federal of Rule of Evidence 403. At minimum, the pardons would likely confuse the jury and could lead the jury to consider the pardons dispositive of innocence. *Kerr v. City of Chicago*, 424 F.2d 1134, 1139 (7th Cir. 1970) ("[T]he issue of guilt or innocence is irrelevant and the jury must not be confused."). A jury would certainly "be moved by th[e] evidence, and likely to a significant degree."

19

*Howard v. City of Durham*, No. 1:17CV477, 2021 WL 5086379, at *6 (M.D.N.C. Nov. 2, 2021).

### B. The District Court improperly permitted Britt to speculate on the heart of the case and opine against Defendants' credibility.

Johnson Britt was Plaintiffs' first and likely most important witness. The District Court's treatment of his testimony was detrimental to Defendants' case. Over repeated objection, the court allowed Britt to speculate as to the core disputes in the case as well as opine on Defendants' credibility. On top of this, the District Court then vouched for Britt's character. This error justifies a new trial.

#### 1. *Britt's opinions were not lay testimony.*

As an initial matter, the District Court erred in admitting Britt's opinions because Plaintiffs did not identify Britt as an expert witness under Rule 26(a)(2)(B) (retained experts) or Rule 26(a)(2)(C) (hybrid witnesses). So Britt could not offer *any* opinion unless it was based on personal knowledge. *See* Fed. R. Evid. 701. Britt, however, was not involved in the interrogations and has no first-hand knowledge of the events or Defendants. *See United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) ("None of [the witnesses] observed [the defendant's

conduct] . . . making their testimony similar, if not indistinguishable, from [expert testimony].”). Rather, as Plaintiffs conceded below,[7] Britt purported to base his testimony on his general “knowledge of criminal investigations and interrogations,” but “[l]ay witnesses are not entitled to opine broadly or generally.” *United States v. Hassan*, 742 F.3d 104, 135 (4th Cir. 2014) (citation and internal quotation marks omitted).

### 2.    Britt usurped the jury's role.

The “determination of credibility is one strictly for the jury.” *United States v. Cecil*, 836 F.2d 1431, 1441 (4th Cir. 1988). Yet Britt directly attacked Defendants' credibility:

> [PLAINTIFFS' COUNSEL]: [D]efendants in this case have described the interrogation of Henry and Leon as calm, with no raised voices, no name calling, no lies, no threats made, no promises made to them . . . . [D]o you *find those descriptions credible*?
>  . . . .
>
> [BRITT]: No, sir.

[JA1080].

Because Britt's testimony extended into the second day of trial, he reminded the jury the next morning that he “did not believe” Defendants'

---

[7]  [D.E. 445 at 19].

version of events. [JA1091]. He added his opinion about what did happen. [*Id.*] ("I believe that there would have been yelling, there may have been cussing, there may have been swearing, there may have been threatening remarks made.")]. And he specifically attacked Snead, who was not present to respond: "Snead's reputation as an interrogator was that he was a specialist that was brought in to . . . break a person during the course of an interview." [JA1092].

The District Court, in sum, allowed Britt to encroach on "the jury's exclusive purview," *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013), which was error. *See Cecil*, 836 F.2d at 1441. *See, e.g.*, *United States v. Brown*, 62 F. App'x 516, 521 (4th Cir. 2003) ("Therefore, we conclude that the District Court erred in admitting that portion of Inspector Allen's testimony that speculated as to Brown's credibility.").

### 3.  *The error was not harmless.*

Plaintiffs previously argued—and the District Court concluded— that allowing Britt's testimony was harmless because Defendant cannot show that it "substantially swayed" the verdict. [D.E. 445 at 20. (alteration in original) (citation and internal quotation marks omitted)]. But Plaintiffs misstate the scope of harmless-error review. Defendants

need not prove the judgment *was* "substantially swayed." [D.E. 445 at 20]. This Court instead must have "fair assurance . . . that the judgment *was not* substantially swayed by the error." *Smith v. Baltimore City Police Dep't*, 840 F.3d 193, 204 (4th Cir. 2016) (emphasis added); *see also Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) ("In the words of the Supreme Court: [I]f one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." (citation and internal quotation marks omitted)).

Plaintiffs similarly downplay Britt's role. But because the dispute between Defendants' and Plaintiffs' descriptions of the interviews was at issue, "the jury's view of [Defendants'] credibility and character was necessarily central to its verdict." *Smith*, 840 F.3d at 205.[8] Plaintiffs in fact relied heavily on Britt's opinions to prove their case:

> [PLAINTIFFS' COUNSEL]: Remember what Johnson Britt said. Please remember what he said. He testified under oath, Snead was the SBI's closer. He was brought in to break suspects. That was the testimony of Johnson Britt.

[JA1853].

---

[8] *See also Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 720 (4th Cir. 2014) (rejecting harmless-error argument where the evidence—even if only minor—concerned the "theory of the case").

23

[PLAINTIFFS' COUNSEL]: [Y]ou don't have to take my word for it just as argument. The DA for 25 years, *Johnson Britt, knows better and he told you so.* He knew these four men. He told you that Snead was their closer. He was a, quote, specialist that was brought in to apply pressure and break you during an interview. He was brought in to break you. Snead. The one who sat right across from Henry. Snead. The one who led Henry's questioning. Snead. The one who told Henry to tell Leon that he confessed. Snead. Who kicked everyone out of Leon's room so he could break Leon, too.

[JA1859].

[PLAINTIFFS' COUNSEL]: Johnson Britt told you that there would have been yelling in that room, there would have been cussing, there would have been swearing, there would have been threats.

[JA1860].

The District Court's support of Britt, moreover, elevated the effectiveness of his improper and prejudicial testimony. Again, after Britt attacked Defendants' credibility and character, the District Court declared Britt "one of the most renowned district attorneys in America." [JA1106–07]. And he noted that Plaintiffs "couldn't find anybody whose credentials are more sacred." [*Id.*]. This bolstering—which was itself reversible error—highlights the need for a new trial. *Anderson v. Warden, Maryland Penitentiary*, 696 F.2d 296, 299 (4th Cir. 1982) ("It was for the jury to determine which of the witness' stories would be given credence, or indeed whether the witness would be believed at all.").

24

## C.    The District Court advocated for Plaintiffs and bolstered their case.

A district court has discretion to control a trial, but "there are limits to that discretion." *United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017). A court violates those limits anytime it shows an "appearance of bias or partiality"—for example, by becoming "overly involved" in the trial itself. *Id.* (citation and internal quotation marks omitted). Indeed, "a pattern of one-sided interruptions" may show favoritism to the other side. *Id.*; *see also United States v. Cassiagnol*, 420 F.2d 868, 879 (4th Cir. 1970) ("Constant or persistent interruption of defense counsel may have the effect of contaminating the jury's verdict by indicating the judge's evaluation of the weight of the evidence and the merits of the defense."). Even "rhetorical questions and comments" may warrant a new trial if they are "ill-advised." *See Lefsih*, 867 F.3d at 466–67 (vacating judgment because the district court "negatively characterized" an immigration program).

The District Court here breached the limits of its discretion repeatedly. Before a single witness took the stand, the District Court told Defendants' counsel he would "sit [counsel] down" if counsel attempted to question Plaintiffs' innocence. [JA1036]. Immediately after the

25

comment, the District Court told counsel that "the jury takes note of" his "bad start." [JA1037]. And the District Court threatened to revoke counsel's right to cross examination at least three times, which it told counsel they could "take [ ] up with the Fourth Circuit." [*See, e.g.*, JA1111; JA1207 ("You need to get there because your time limits are going to be changed if this keeps up. So let's go."); JA1255]. And to the extent any doubt remained about the District Court's bias against Defendants, it clarified its position during Plaintiffs' testimony.

The District Court told the jury that Defendants' "version is that [McCollum is] a murderer and . . . that he ought to be executed." [JA1323]. As for Brown, the District Court later explained that counsel "want[ed] to say that [Brown is] a murderer and a rapist" and "convict him again." [JA1362]. Even under a plain-error standard of review, the District Court's bias warrants a new trial. *See Lefsih*, 867 F.3d at 469–70.

**D.    The District Court deprived Defendants of their qualified immunity defense.**

The District Court fundamentally erred in its treatment of Defendants' qualified immunity defense at trial. Defendants were deprived of their entitlement to have the jury resolve the disputed

26

historical facts in a fashion that would have allowed meaningful resolution of the defense by the District Court or, alternatively, through appellate review. Although the District Court submitted special interrogatories to the jury, those interrogatories were inadequate in form and in substance. *See Deadwyler v. Volkswagen of America, Inc.*, 884 F.2d 779, 782 (4th Cir. 1989) (explaining that a district court abuses its discretion by misapprehending the law regarding the underlying legal issues involved); *see also*, *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002) ("In a proper case, the use of special interrogatories going to the qualified immunity defense is not discretionary with the court."), *abrogated on other grounds*, *Patel v. Lanier County*, 969 F.3d 1173, 1186 (11th Cir. 2020).

In *Willingham v. Crooke*, 412 F.3d 553 (4th Cir. 2005), this Court joined numerous other circuits in holding that it is inappropriate to submit the issue of qualified immunity to a jury. *See id.* at 560 (citing cases). Juries are "ill suited to make the determinations of law required by the qualified immunity analysis." *Id.* at 560 (citing *Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001)). Thus, when disputes of material fact preclude a conclusive ruling on qualified immunity at the

27

summary judgment stage, a district court is required to submit "factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Id.*

Following this Court's guidance in *Willingham*, Defendants timely submitted narrowly tailored interrogatories designed to provide adequate grounds for resolving the qualified immunity defense post-verdict. The District Court, however, flatly rejected them in favor of Plaintiffs' proposed interrogatories. That was double error. As the Eleventh Circuit has explained,

> Because a public official who is put to trial is entitled to have the true facts underlying his qualified immunity defense decided, a timely request for jury interrogatories directed toward such factual issues should be granted. Denial of such a request would be error, because it would deprive the defendant who is forced to trial of his right to have the factual issues underlying his defense decided by the jury.

*Cottrell v. Caldwell*, 85 F.3d 1480, 1487–88 (11th Cir. 1996).

Similarly, in cases like this one, where the defense is "intertwined with factual questions," the failure to submit factually specific questions essentially relegates the issue of qualified immunity to the jury. *See Littrell v. Franklin*, 388 F.3d 578, 585 (8th Cir. 2004) (explaining that in

28

such cases the court should "tailor special interrogatories *specific to the facts of the case*" (emphasis added)). "[A] defendant's entitlement to qualified immunity *under a particular set of facts* should be decided by the court, not by the jury." *Willingham*, 412 F.3d at 560 (emphasis added). Qualified immunity presupposes that government officials may make reasonable but mistaken judgments as to what the law requires under various factual scenarios. Thus, asking the jury in general terms— for example, "were Plaintiffs' confessions coerced?"—answers nothing about whether a reasonable official at the time would have understood the particular conduct in the particular circumstances to be constitutionally infirm. Yet over several objections, the District Court overruled Defendants' objections raising these concerns, and it claimed they were unfounded.

But as Defendants' counsel explained at the charging conference, the District Court put "the cart before the horse." [JA1819]. The "fact specific questions of historical conduct" should have been submitted to the jury, and then, the District Court should have resolved whether there was a violation of Plaintiffs' clearly established rights. [*Id.*]. The jury decides the "'who-what-when-where-why type of historical factual

issues,'" while the court determines the ultimate legal question of whether a violation of clearly established law occurred. *Simmons v. Bradshaw*, 879 F.3d 1157, 1165 (11th Cir. 2018) (quoting *Cottrell*, 85 F.3d at 1488); *see id.* at 1165–67 (ordering new trial based on similar error as occurred below). This is of course one proper allocation of responsibility between the judge and the jury. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2nd Cir. 2007) ("One the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimately determination of whether the officer's conduct was objectively reasonable is to be made by the court."). And it balances the jury's fact-finding role with the principle that the qualified immunity defense should be resolved as soon as possible.

Alternatively, the district court could have proceeded as it did and resolved the issue post-verdict, notwithstanding the jury's conclusion on the question of one or more constitutional violations. But in proceeding in this fashion, factually specific interrogatories were *even more* critical to preserve proper resolution of the defense by the District Court post-verdict, or this Court. After all, "the jury could have found a constitutional violation but nevertheless based that judgment on a set of

30

facts less egregious than the one presented in [Plaintiffs'] case in chief—and thus, Defendants may have been entitled to qualified immunity." *See Cavannaugh v. Woods Cross City,* 718 F.3d 1244 (10th Cir. 2013). Defendants and their co-defendants extensively briefed the issue, pleading with the court on numerous occasions—even providing specific examples of verdict forms from around the circuit as examples—to no avail. [JA952–54].

The only question, then, is whether the District Court's error was harmful. *Simmons,* 879 F.3d at 1167 (explaining when error will be found harmless). It was. The Supreme Court has repeatedly admonished lower courts for defining clearly established rights at a high level of generality. *E.g., Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). But that is precisely how Plaintiffs' special interrogatories were drafted and submitted: (a) were the confessions coerced or fabricated; (b) was material exculpatory evidence suppressed before Plaintiffs' trials; (c) was it suppressed after Plaintiffs' trials, and (d) was the failure to investigate Roscoe Artis done in bad faith. These questions were framed at such a high level of generality—and failed to address the

31

specific factual disputes—that the jury's Yes/No answers say nothing about whether a reasonable officer under similar factual circumstances would have concluded that legal precedent in the year 1983 "clearly proscribed" Defendants' conduct. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).

Nothing can be gleaned from the jury's answer to the special interrogatories that would have properly allowed the District Court to resolve the qualified immunity defense post-verdict. *But see Cavannaugh*, 718 F.3d at 81 (providing examples of factual specific questions that would have been appropriate to submit); *Stephens v. Doe*, 332 F.3d 68, 81 (2nd Cir. 2003) (same). As to whether the confessions were coerced, the test considers a totality of the circumstances, involving a number of factors. *See, e.g.*, *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014). No question given to the jury could have possibly aided the District Court in balancing those factors from the perspective of a reasonable official in 1983. Indeed, this Court's previous decision affirming the denial of Defendants' qualified immunity defense at summary judgment was based on the existence of disputes as to whether threats of the gas chamber were uttered, racial epithets were yelled, or

the signed confessions were fabricated, *see Gilliam v. Sealey*, 932 F.3d 216, 236 (4th Cir. 2019). These were exactly the questions that Defendants pleaded with the Court to submit to the jury. [JA1798]. Yet, the District Court refused, instead bluntly asking whether the confessions were "coerced or fabricated." As for whether material exculpatory evidence was suppressed, the jury was not asked what evidence *these Defendants* suppressed, or even how they suppressed it. Instead, the question propounded was simply whether material exculpatory evidence was "suppressed." Plainly, the district court left no room between prong one and prong two of the analysis; the inquiry was one and the same. *See Simmons*, 879 F.3d at 1166 ("[T]here was no room for the jury to find that Deputy Lin used excessive force and also the District Court to decide that he was entitled to qualified immunity.").

In fact, it is evident from the District Court's post-verdict order on qualified immunity that the court simply understood the function of the special interrogatories as doing nothing more than *clarifying* what claims Plaintiffs proved via the jury's general verdict. Question 1 on the verdict form asked whether Plaintiffs' "constitutional rights were violated," while the special interrogatories teased out on which claims Plaintiffs

33

actually prevailed. If the jury determined Plaintiffs' confessions were coerced, then, according to the District Court, that *necessarily* meant a violation of clearly established law.

### E. Cumulatively, the District Court's errors also overwhelmingly justify a new trial.

Even if each error were alone insufficient, viewed together, the District Court's errors violated the trial's fundamental fairness. *Ward v. AutoZoners, LLC*, 958 F.3d 254, 273 (4th Cir. 2020) (explaining that enough errors to "fatally infect" a trial and render it "fundamentally unfair" could justify reversal). The District Court decided a dispositive issue (innocence) without support, allowed a key witness (Britt) to opine on credibility, advocated for Plaintiffs at every turn, and deprived defendants of a meaningful opportunity to present their qualified immunity defense at trial. *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013) ("[Defendants have] established a long list of trial errors."). [9] Viewed cumulatively, the District Court's errors deprived Defendants of a fair trial.

---

[9] Although this Court has not definitively decided that the cumulative-error rule applies in civil cases, no reason justifies refusing to extend it here. *Jerden v. Amstutz*, 430 F.3d 1231, 1240 (9th Cir. 2005).

**F.    The District Court's conduct warrants reassignment on remand.**

Given the District Court's open bias and repeated errors, this Court should reassign this case to a different court on remand. Proving bias in fact is not necessary to justify reassignment. *United States v. Lentz*, 383 F.3d 191, 222 (4th Cir. 2004). A "suspicion of partiality" will suffice. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017); *see, e.g.*, *United States v. Aberant*, No. 19-4786, 2021 WL 5401474, at *4 (4th Cir. Nov. 18, 2021); *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 Fed. App'x 118, 130 (4th Cir. 2019) ("Judge Boyle's statements indicate that he had no intention of managing a trial with respect to any claims in this case."); *United States v. Strickland*, No. 08-4640, 2010 WL 235080, at *5 (4th Cir. Jan. 21, 2010).

**II.    Plaintiffs should not have been awarded $36 million in prejudgment interest.**

Following trial, Plaintiffs moved to amend the judgment under Federal Rule of Civil Procedure 59(e) to include an award of prejudgment interest on their $62 million compensatory damages award. The District Court granted the motion and awarded Plaintiffs an additional $36

million thereby increasing the compensatory damages awarded by the jury by more than 50 percent. The District Court thought this was necessary to prevent a manifest injustice. The District Court, however, lacked discretion to award Plaintiffs prejudgment interest, and even assuming otherwise, the sheer size of the award itself demonstrates that it was punitive in nature.

Prejudgment interest is not meant to serve a punitive function. Rather, the rationale for awarding it is to ensure a party receives full compensation. *City of Milwaukee v. Cement Div. Nat. Gypsum Co.*, 515 U.S. 189, 195 (1995). It is intended to compensate the successful plaintiff due to the defendant's wrongful detention of the plaintiff's funds from the time the claim accrued to the date judgment is entered. *W. Va. v. U.S.*, 479 U.S. 305, 310 n.2 (1987). In other words, the past economic loss is adjusted to present value through the award of prejudgment interest. Thus, it is generally available only as a remedy to adjust past economic damages. *See, e.g.*, *Poleto v. Consol. Rail Corp.*, 826 F.2d 1270, 1278 n.14 (3rd Cir. 1987).

But prejudgment interest is not available as an item of damage in § 1983 litigation seeking compensation for pain and suffering. The

District Court's observation regarding the statute's silence on the matter should have been a telling clue that such an award was improper. The statute's silence is of course not dispositive on the availability of prejudgment interest. *See Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 336–37 (1988) (hereinafter "*Monessen*"). But when considered "in the appropriate historical context" surrounding § 1983's enactment, congressional silence should not be interpreted as abrogating well-settled principles of common law that existed at the time of the statute's enactment. *See id.* (holding "well-established doctrine barring the recovery of prejudgment interest" was not abrogated in the FELA *sub silentio*); *see also Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 306 (1986) (explaining that damages in a Section 1983 suit are "determined according to principles derived from the common law of torts"). At the time § 1983 was enacted, the common law did not provide for awards of prejudgment interest on personal injury actions seeking recovery for pain and suffering. *See, e.g.*, *Mowry v. Whitney*, 81 U.S. 620, 653 (1871) ("Interest is not generally allowable upon unliquidated damages."). Thus, and as the Supreme Court held in *Monessen* with respect to claims under the

37

FELA, § 1983 should not be interpreted as providing for an award of prejudgment interest, here.[10]

Even if prejudgment interest were available for pain and suffering on a discretionary basis, the jury should have decided whether to assess it, not a district court. Federal law dictates that "in actions at law when the award of interest rests in discretion, it is the jury who must exercise it." *Newburgh Land & Dock Co. v. Texas Co.*, 227 F.2d 732, 735, 735 n.28 (2nd Cir. 1955) (citing cases); *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 13 (1st Cir. 1990) ("[I]n an action brought under 42 U.S.C. § 1983, the issue of prejudgment interest is so closely allied with the issue of damages that federal law dictates that the jury should decide whether to assess it."); *Havis v. Petroleum Helicopters, Inc.*, 664 F.2d 54, 55 (5th Cir. 1981). Plaintiffs therefore forfeited their entitlement to prejudgment interest because they did not present this as an item of damages for the

---

[10] This is not to say that prejudgment interest would never be allowed for a damages award under § 1983. For example, it would be appropriate in a § 1983 case involving a wrongful termination where the jury awards the successful plaintiff back pay. *See Gierlinger v. Gleason*, 160 F.3d 858, 873–74 (2nd Cir. 1998). In this sense, the prejudgment interest appropriately compensates the plaintiff for the time value of the loss of funds that were wrongfully denied to the plaintiff. *But see Barnard v. Theobold*, 721 F.3d 1069, 1078 (9th Cir. 2013) (concluding Section 1983 allows for prejudgment interest awards on pain and suffering).

jury to consider and award. *Cordero*, 922 F.2d at 15 ("Consequently, the award of prejudgment interest must be stricken.").[11]

Finally, if this Court nevertheless concludes that the District Court itself possessed discretion to award prejudgment interest post-verdict, the District Court abused its discretion by awarding Plaintiffs $36 million. The District Court conducted no analysis on why $36 million was an appropriate figure in light of Plaintiffs' $62-million compensatory damages award. For example, the District Court did not consider whether the jury may have considered their $62 million compensatory damages award as factoring in a sum of money that compensated Plaintiffs in today's dollars thereby making an award of prejudgment interest unnecessary. *See McDow v. Rosado*, 657 F. Supp. 2d 463, 466

---

[11] This Court's decision in *Quesinberry v. Life Ins. Co. of N. America*, 987 F.2d 1017 (4th Cir. 1993), which the district court cited for the proposition that the judge has discretion to award prejudgment interest, does not run counter to principle that it is the role for the jury, not the judge. *Quesinberry* was a bench trial with the judge sitting as the finder of fact. 987 F.2d at 1020. "When a court assumes that role, it is entirely appropriate that it exercises its discretion in deciding to award prejudgment interest." *Eden v. Amoco Oil Co.*, 741 F. Supp. 1192, 1196 (D. Md. 1990). "The notion that prejudgment interest is discretionary with the fact finder, however, does not authorize a court, once a jury has determined damages, to add to those damages a sum for prejudgment interest." *Id.*

(S.D.N.Y. 2009) ("When the jury intends to fully compensate the plaintiff for his injuries, additional pre-judgment interest would be punitive, rather than compensatory[.]"). Perhaps the jury did, and in this sense, the issue was appropriately left for the jury to consider. Indeed, the jury was instructed to compensate Plaintiffs for "the reasonable value of each day of confinement." [JA1918]. And the jury ultimately awarded Plaintiffs' a considerable sum. *See Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (7th Cir. 1987) ("The size of the jury's verdict may be another [reason to deny prejudgment interest], if only the supposition that the jury has compensated plaintiff for the time value of money can explain the result.").

Similarly, the District Court failed to consider whether aspects of the $62 million verdict compensated Plaintiffs for future losses. *Id.* (explaining that "the time value of money" is already "taken into account" for awards of future loses). Again, the District Court instructed the jury that it could compensate Plaintiffs for any losses they would "reasonably likely suffer in the future[.]" [JA1918]. And Plaintiffs' counsel argued to the jury to consider a sum of money on a going-forward basis. [JA1871]. So, it was inappropriate to award prejudgment interest to the extent the

40

verdict represented compensation for future harms and losses. *Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 373 (5th Cir. 2002) ("Courts must award prejudgment interest only for past harms.").

The District Court considered none of this, and instead intervened, concluded the jury's record-breaking $62 million still reflected a manifest injustice, and thus, it increased the award by an additional 50 percent. That is not an exercise of discretion: it's the opposite. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993). The $36 million award of prejudgment interest should therefore be vacated.

## III. Defendants should have received a credit against the judgment accounting for Plaintiffs' other recoveries.

The District Court further abused its discretion when it denied Defendants' Rule 59(e) Motion, which sought to amend the judgment to credit the $11.5 million in compensation that Plaintiffs had recovered from the Town, the County, and the State. Plaintiffs should not be permitted to recover compensatory damages in an amount greater than the loss they actually suffered. The one satisfaction rule prohibits such duplicative recoveries, and the judgment should have been amended to address this. Defendants did not waive their entitlement to any credit by raising the issue for the first time in the Rule 59(e) Motion. The District

Court erred as a matter of law in concluding so, and it further erred in denying the Rule 59(e) Motion on the merits. *See Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 388 (4th Cir. 2010) (explaining that a district court "'necessarily abuses its discretion when it makes an error of law'" (quoting *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009)).

## A. Defendants did not waive the issue.

The mistaken waiver rationale advanced by Plaintiffs and ultimately adopted by the District Court was premised on a fundamental misunderstanding of the nature of relief Defendants sought. According to the District Court, Defendants' failure to raise the issue of the credit until their Rule 59(e) Motion resulted in its waiver because "setoff" is an affirmative defense that must be expressly pleaded. Defendants' entitlement to a credit against the judgment was not based in the doctrine of "setoff," however, but in the one satisfaction rule. And Rule 59(e) is a proper vehicle for raising the issue.[12]

---

[12] Unfortunately, it appears Defendants' occasional use of the term "setoff" in the Rule 59(e) Motion (*i.e.* that the amount of the credit should be *set off* from the judgment or the judgment should be *offset* by the credit) may have contributed to Plaintiffs' and the District Court's confusion. *See United Tech. Corp. v. American Home Assurance Co.*, 237 F. Supp. 2d 168, 171 (D. Conn. 2001) ("AH's use of the term 'setoff' provoked UTC to cite numerous cases holding setoffs or counterclaims must be raised in the pleadings.").

"A judgment that can be read to allow a plaintiff to recover twice for the same injury contains a manifest error of law," which Rule 59(e) was specifically designed to address. *Duran v. Town of Cicero*, 653 F.3d 632, 642 (7th Cir. 2011); *Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 385 n.2 (4th Cir. 2010). In fact, prior to the verdict, it appeared to everyone below that this was precisely how the settlements would be addressed—at least with respect to the County. The jury would be instructed not to consider it, and the District Court would address the settlement post-judgment. [JA1840]. As the District Court explained to the jury, addressing how the County's settlement would affect Plaintiffs' compensatory damages was "the job of the Court" after the trial. [JA1922]. So, it was rather strange for the District Court to later conclude that Defendants waived the issue.

Nevertheless, the defense of "setoff" is separate and distinct from the one satisfaction rule. The defense of "setoff" addresses mutual debts between a plaintiff and a defendant: the defendant invokes setoff as a counterdemand against the plaintiff for the plaintiff's own debt to the defendant arising out of a transaction independent of plaintiff's claim. *Setoff*, Black's Law Dictionary (11th ed. 2019). A closer reading of this Court's decision in *Durham v. SMI Indus. Corp.*, 882 F.2d 881 (4th Cir.

43

1989), which the District Court cited when reaching its mistaken holding on waiver, should have revealed this. *See id.* at 883 ("North Carolina law has long recognized the right of setoff *where mutual debts exist between the parties*." (emphasis added)). What Defendants sought, though, was entirely different. *See United Tech. Corp.*, 237 F. Supp. 2d at 171 ("Properly characterized, AH is seeking a credit against the amount of its liability to the extent the payment of prior settlements would result in 'double recovery' . . . not a 'setoff[.]'").

"The one satisfaction rule . . . is not invoked as a counterdemand, but rather as an equitable doctrine[.]" *BUC Intern. Corp. Intern. Yacht Council Ltrd.*, 517 F.3d 1271, 1276 n.5 (11th Cir. 2008) (rejecting same waiver rationale adopted by district court). As this Court has previously explained, the "equitable doctrine operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent plaintiff from recovering twice for the same assessment of liability." *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000). In the context of joint and several liability, the rule guards against overcompensation that can result when several defendants who are jointly liable for a single injury each contribute to plaintiff's recovery. *MacKethan v. Burrus, Cootes and Burrus*, 545 F.2d

44

1388, 1391 (4th Cir. 1976) (reversing district court for refusing to apply credit against judgment based on prior settlements). Thus, it's not an affirmative defense; it's a basic rule of remedies, and it serves as the basis for allowing a non-settling defendant to receive a credit against a judgment based on settlements the plaintiff received from other defendants. *See* Restatement (Second) of Torts, § 885(3) (1979); Restatement (Second) of Judgments, § 50 cmt. c, illus. 1 (1982); *see also, e.g.*, *One Satisfaction Rule*, Black's Law Dictionary (11th ed.) ("[The one satisfaction rule] is, for example, one of the foundations of a defendant's right to have a jury verdict reduced by the amount of any settlements the plaintiff has received from other entities for the same injury.").

The law simply does not allow a plaintiff to recover compensatory damages in an amount greater than that which is necessary to make the plaintiff whole. *Snowden v. D.C. Transit Sys., Inc.*, 454 F.2d 1047, 1048 (D.C. Cir. 1971). ("A cardinal principle of law is that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered."). "Whether there is one tortfeasor or ten, the injured party may only recover once." *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir. 1988). Neither the "egregiousness of the injury" nor the "complexity of

the case" provides an exception to the rule. *Id.*; *Kassman v. American Univ.*, 546 F.2d 1029, 1031, 1035 (D.C. Cir. 1976). Thus, when raised, the non-settling defendant "is *entitled* to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2nd Cir. 1989) (emphasis added). So, Defendants "did not waive this legal point about the nature of [their] liability" by raising their entitlement to a credit in their Rule 59(e) motion. *See Duran*, 653 F.3d at 642 (reversing district court's denial of Rule 59(e) motion addressing double-recovery issue based on waiver rationale).

## B. The District Court erred in refusing to apply any credit.

Suspecting the waiver rationale did not stand on strong footing, the District Court also addressed the merits of Defendants' Rule 59(e) Motion and still refused to apply *any* credit. The District Court reasoned that Plaintiffs' statutory award from the State did not represent common damages, and thus, the one satisfaction rule did not apply for this sum. With respect to Plaintiffs' settlements with the other defendants, the District Court found (under its Section 1988 analysis) that it would be

"inconsistent" with Section 1983's remedial scheme to apply the dollar-for-dollar approach embraced by North Carolina law. Both conclusions were erroneous.

The statutory award Plaintiffs received from the State under N.C.G.S. § 148-82 compensated them for their pecuniary loss they sustained by their wrongful confinement. This was compensation for the same injuries for which Plaintiffs sought recovery against Defendants. *See Chisholm*, 205 F.3d at 737. The District Court held that Plaintiffs were only compensated by the jury for their pain and suffering and not any pecuniary loss sustained as a result of their confinement.[13] Yet, the District Court's instructions to the jury explicitly authorized the jury to award Plaintiffs damages to compensate them for "the reasonable value of each day of confinement." [JA1918]. Thus, the sum Plaintiffs received from the statutory proceeding should have been included as common damages that the jury ultimately awarded against Defendants. *See Dionne v. Mayor & City Council of Baltimore*, 40 F.3d 677, 685 (4th Cir. 1994) ("Any damages awarded under §1983 will be reduced by the

---

[13] The District Court's conclusion in this respect is especially strange because it necessarily disclaims any basis upon which the $36 million prejudgment interest award could stand.

amount of any duplicative relief received in [the] earlier administrative proceeding.").

Given that federal law is silent on the issue of how to calculate the amount of the settlement credit, North Carolina's dollar-for-dollar approach should have been incorporated and applied under Section 1988. *See Battle v. Ledford*, 912 F.3d 708, 712–13 (4th Cir. 2019) (explaining Section 1988's gap filling role). [14] North Carolina, like many other jurisdictions, has embraced the dollar-for-dollar (or, "pro tanto") method of calculating a settlement credit in the context of joint and several liability, both as a principle of common law and statutory law. *See Baity v. Brewer*, 122 N.C. App. 645, 470 S.E.2d 836, 838 (1996); N.C.G.S. § 1B-4(1). The District Court concluded, however, that applying this approach runs counter to Section 1983's remedial scheme. But, to be "inconsistent" with federal law the state-law rule must defeat Section 1983's principle goals of compensation and deterrence. *Battle*, 912 F.3d at 714–15. And neither goal is frustrated here by applying the dollar-for-dollar

---

[14] Critically, federal law is not silent as to the issue of whether the one satisfaction rule applies. It does. *See, Singer*, 878 F.2d at 600; *MacKethan*, 545 F.2d at 1390–91. Federal law is only silent as to how the credit should be calculated (*i.e.* a dollar-for-dollar approach or a proportionate share approach).

48

approach—whether viewed as a categorical matter or under the particular circumstances of the case. *See Burke v. Regaldo*, 935 F.3d 960, 1046 (10th Cir. 2019).

Where, as here, "a plaintiff receives the jury-determined value of the injury *and* an additional amount through settlement for a single, indivisible injury, the plaintiff receives a windfall." *Goad v. Macon County*, 730 F. Supp. 1425, 1431 (M.D. Tenn. 1989). Thus, Section 1983's goal of compensation "is in no way compromised" by applying a dollar-for-dollar credit. *Id*. "On the contrary, the theoretical purity of this purpose is actually tainted by a refusal to apply" the dollar-for-dollar credit. *Id.* So, adhering to the dollar-for-dollar approach simply ensures that Plaintiffs only receive the amount the jury determined they were due and no more, consistent with the goal of compensation. It does not result in Plaintiffs receiving any less than the jury determined they were due. *Compare Mason v. City of New York*, 949 F. Supp. 1068, 1078 (S.D.N.Y. 1996), *with Banks ex rel. Banks v. Tokemick*, 177 F. Supp. 2d 239, 263 (S.D.N.Y. 2001); *see also Burke*, 935 F.3d at 1046 ("Although it is possible that many applications of a state setoff statute would conflict with § 1983, the categorical approach fails to recognize that the state-law

setoff in a given case may not conflict with § 1983's goals, depending on the size of the settlement.").

Providing a dollar-for-dollar credit likewise does not contravene Section 1983's goal of deterrence. As a district court for the Middle District of Tennessee persuasively explained in its exhaustive analysis of the issue, "the same 'quantity' of monetary threat still looms over the potential actor's head as he contemplates conduct regardless of whether the law allows for settlement set-offs or not." *Goad*, 730 F. Supp. at 1431.

Moreover, "[t]o the extent that there may sometimes be a greater need to serve the goal of deterrence, that need can be met through the possibility of punitive damages," which the jury awarded Plaintiffs here. *See Goad*, 730 F. Supp. at 1431. But it is illogical to conclude that reducing the $62 million judgment (really $98 million after the erroneous prejudgment interest award) by $11.5 million to account for Plaintiffs' other recoveries could somehow incentivize future misconduct, as the District Court seemed to conclude. *See Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 310 (1986) ("Section 1983 presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations.").

50

In sum, the District Court's order on Defendants' Rule 59(e) Motion should be reversed and the District Court should be directed to credit the compensatory damages portion of the judgment by $11.5 million.

## IV.   The district court abused its discretion in awarding $6.5 million in attorney fees and costs under Section 1988.

Defendants recognize that § 1988 fee awards should not result in a second-round of litigation and that this Court's review of the District Court's award $6.5 million in fees and costs under § 1988 is highly deferential. Nevertheless, the district court abused its discretion in two main respects and ultimately provided a windfall to Plaintiffs.

### A.   The district court erred in awarding out-of-district rates.

First, the District Court inappropriately awarded Plaintiffs' their counsel's out-of-district rates. The team of Hogan Lovells ("HL") attorneys claimed the following hourly rates as prevailing in the Washington, D.C. market:

- $920–$984 per hour for partner-level attorneys;

- $424–$744 per hour for associate-level attorneys; and

- $292 per hour for paralegals.

51

[*See* JA2406; JA2440–41]. But Plaintiffs failed to carry their burden of demonstrating these out-of-district rates were reasonable. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (hereinafter *Rum Creek*) (explaining that both hours expended and rates charged "must" be reasonable); *Pyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) ("burden rests with fee applicant to establish the reasonableness of a requested rate").

Congress did not intend on providing a windfall to prevailing civil rights litigants when it enacted § 1988. Rather, Congress displaced the American Rule for awards of attorney fees in order to ensure that persons with civil rights grievances would have effective access to the judiciary. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). In other words, Congress wanted to provide enough of an incentive that competent counsel from the geographic area would be attracted to representation of civil rights litigants. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 731 (1987). The rates above, however, are grossly in excess of the range of rates a competent North Carolina civil-rights plaintiffs' lawyer would charge. *See Buffington v. Baltimore County*, 913 F.2d 113 (4th Cir. 1990) ("The district court should reconsider whether

the hourly rates for these attorneys comport with the underlying purpose of [§ 1988].").

Indeed, the District Court need not have looked any further than the rates charged by Plaintiffs' local counsel. As their local counsel averred, he is extremely competent and well-regarded as an experienced attorney having practiced extensively in the Eastern District of North Carolina in litigation similar to this case. [*See* JA2619 ("Much of my legal work has focused on prosecuting challenges to unconstitutional conduct by law enforcement.")]. Furthermore, Plaintiffs' local counsel provided many substantive contributions to the litigation: "preparing the Plaintiffs for their testimony and conduct[ing] the direct examination of the Plaintiffs, deposing both of Defendants' expert witnesses, and cross-examining the Defendant's expert witness and one of the two living Defendants at trial." [*Id.*]. Thus, were there any question of what the prevailing market rate for a competent partner-level attorney in the community for this type of litigation is, it was his own rate. *See Robinson*, 560 F.3d at 245 (explaining that evidence of what the plaintiff's attorney actually charged his client can be indicative of the prevailing market rate but is not enough standing alone).

Although the District Court had discretion to award out-of-district rates under certain circumstances, Plaintiffs did not meet their burden of justifying a departure from the presumption of the market rate in the district. In *Nat'l Wildlife Fed. v. Hanson*, 859 F.2d 313 (4th Cir. 1988), this Court adopted a two-part test to determine whether an award of out-of-district rates is appropriate. In applying that test, the court should first ask whether the out-of-district counsel "rendered services that were truly available in the visited market." *Id.* Second, the court should ask if the party that hired the out-of-district counsel "chose reasonably, or whether they chose an unnecessarily expensive attorney." *Id.* Here, the district court clearly erred in finding the test satisfied under both prongs.

First, the HL attorneys rendered services that were available in this market. Again, local counsel and his firm provided competent representation to Plaintiffs. Yet their guardian ad litem, Tarlton, averred, in somewhat conclusory fashion, that "no attorney, with the required skills, was available locally." [JA2639]. He reached this conclusion, however, based on contacting one firm that ultimately "had a conflict of interest," contacting some *unspecified* number of other firms that "had preexisting commitments," and his speculation that "none of

54

the firms" he contacted would have been likely to accept the case, "seeking only fees under 28 U.S.C. § 1988 if they won the case." [*Id.*]. That is not a sufficient showing. *See Project Vote/Voting for America, Inc. v. Long*, 887 F. Supp. 2d 704, 712 (E.D. Va. 2012) ("Project vote's idle speculation that the case 'was likely to be politically distasteful for local counsel' does not satisfy its burden."). Furthermore, it completely ignores Mr. Abrams's and his firm's representation in this case. *See Yamaha Motor Corp. v. Jim's Motorcyle, Inc.*, 381 F. Supp. 2d 499, 505 (E.D. Va. 2005). And it likewise ignores the other potential attorneys that Defendants have identified who could have competently represented Plaintiffs in this case. [*Cf.* JA2766].

Plaintiffs similarly fail under the second part of the test. Tarlton averred that he analyzed the case and "determined that it required attorneys who had significant experience with complex civil rights cases and constitutional claims relating to wrongful convictions," and thus, he deemed it necessary to retain the HL attorneys, given their expertise. [JA2639]. As explained by Defendants' expert, however, this notion is belied by the very fact that 92 percent of the work performed on the case by the HL attorneys was performed by HL associates "with limited or no

experience at an average rate of $650.00 per hour." [*See* JA2771]. No client "actually paying the bills" would "under any circumstances agree to pay an average rate of $650 per hour for *ten* attorneys with none to little legal experience performing 92% of the work on any case." [*Id.*]. As the Supreme Court remonstrated in *Hensley*, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." 461 U.S. at 434. In the end, there is nothing in the submitted time entries that suggests the resources of a Washington D.C. firm were necessary to litigate the issues presented.

Tarlton further averred that the added benefit of HL's competent and experienced appellate counsel was necessary, but he does not explain why no appellate counsel in the district could be associated to assist Mr. Abrams. Furthermore, the HL partner-level attorney who was primarily responsible for appellate strategy "spent only 15.50 hours reviewing and editing the Brief," merely 5 percent of the total 325.9 hours expended. [JA2762]. In other words, the HL associates (most of whom were just recently out of law school) spent 310 hours drafting a reply brief in which they were the prevailing party below. Plaintiffs are "certainly free to retain counsel of [their] choice to represent [them]," but they "may not secure payment of the higher rates charged by Washington D.C. counsel

56

under the law applicable to the award of attorney's fees under Section 1988." *Id.*

### B. The District Court erred in when it awarded virtually all of the hours claimed by the HL attorneys.

Second, the District Court erred in refusing any material reduction to the claimed 9,000 hours of billed time. Claiming this number of hours as reasonable does not reflect proper billing judgment. Billable hours that would not, in good faith, be billed to one's own client are not properly billed to one's adversary pursuant to a statutory award of fees. *Hensley*, 461 U.S. at 434. Thus, the reasonable and ethical practice for a prevailing party's counsel should be to exclude from the fee request hours that are (1) excessive, (2) redundant, or (3) otherwise unnecessary in light of the circumstances of the case. *Id.* As explained below, Plaintiffs' attorneys did not exercise good billing judgment, and thus, thousands of hours should be reduced.

For example, Defendants identified 575.2 hours that were dedicated to preparing witness lists and exhibits for the five-day trial, amounting to $324,593 in requested fees. Similarly, more than $558,457.90 in requested fees were allocated to internal office discussions and meetings among the HL attorneys. [JA2780].

Additionally, more than $254,561 was claimed in fees that were duplicative as a result of unreasonable staffing of the case. *See Rum Creek*, 31 F.3d at 180 (explaining that Fourth Circuit has "been sensitive to the need to avoid use of multiple counsel for tasks where such use is not justified"). For the trial itself, the HL attorneys staffed it with their lead trial counsel and local counsel and then *eight* more attorneys and a paralegal. This amounted to an additional 601.1 hours of time—not including trial preparation. And multiple HL attorneys attending depositions and other court hearings was more than routine procedure for Plaintiffs. [JA2772–75].

Lastly, the HL attorneys submitted an inordinate amount of billing entries that reflected block-billing, a practice universally "disfavored in federal courts." *Lamonaca v. Tread Corp.*, 157 F. Supp. 3d 507, 519 (W.D. Va. 2016). Of the total 9,734 hours submitted by the HL attorneys, Defendants' expert determined that almost 6,000 hours constituted block-billing. [JA2785]. The District Court conceded that the use of block-billing was prevalent; however, it declined to reduce any of the claimed hours because it found that the entries were sufficient to engage in its review.

While Defendants do not expect this Court to engage in an exhaustive review of the attorney fee award (assuming it stands), the district court's rubber-stamping of the $6.5 million award of fees and costs is further evidence that the District Court decided how this case would result from the outset.

## CONCLUSION

For the reasons above, Defendants-Appellants respectfully request that the Court vacate the judgment and remand the case for a new trial to be reassigned on remand.

## STATEMENT RESPECTING ORAL ARGUMENT

Defendants respectfully request oral argument, which Defendants think would assist the Court. As the District Court seemed to believe, this case involves one of the largest jury verdicts in a wrongful conviction case to date. Argument would therefore assist the decisional process.

Respectfully submitted,

*/s/ Scott D. MacLatchie*
Scott D. MacLatchie
HALL BOOTH SMITH, PC
11215 North Community House Road
Suite 750
Charlotte, NC 28277
(980) 948-7820

59

Adam F. Peoples
HALL BOOTH SMITH, PC
72 Patton Avenue
Asheville, NC 28801
(828) 232-4481

Austin A. Atkinson
Pearson K. Cunningham
HALL BOOTH SMITH, PC
191 Peachtree Street, NE
Suite 2900
Atlanta, GA 30303
(404) 954-5000

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>11,890</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Scott D. MacLatchie*
Scott D. MacLatchie
HALL BOOTH SMITH, PC
11215 North Community House Road
Suite 750
Charlotte, NC 28277
(980) 948-7820

*Counsel for Appellants*

61